(No. 31880.—)

LILLIAN F. BOWMAN *et al.,* Appellees, *vs.* CAROLINE G. MEIER PETTERSEN, Appellant.

*Opinion filed November 27, 1951—Rehearing denied Jan. 21, 1952.*

520

WILLIAM H. SCHULTZ, of Chicago, (CHARLES D. SNE-WIND, of counsel,) for appellant.

RICHARD P. RUNKE, and WILLIAM GILLESPIE, both of Chicago, for appellees.

Mr. CHIEF JUSTICE DAILY delivered the opinion of the court:

This is an action in equity instituted in the superior court of Cook County by appellees Lillian F. Bowman, Roy W. Felkner and Robert J. Schuback, the heirs of William L. Felkner, deceased, against Caroline G. Meier Pettersen, appellant, to impress a trust in favor of appellees upon certain real estate, the legal title to which stood in the names of appellant and deceased at the time of the latter's death. Issues were formed under the fourth amended complaint filed in the cause and a hearing was held before a master in chancery. Upon his recommendation the chancellor entered a decree which found that appellant held title to the real estate in trust for the use and benefit of appellees and directed her to convey the premises to them. A freehold being involved, appellant has brought a direct appeal to this court.

The facts show that William L. Felkner was eighty-three years old when the disputed property was purchased. He was a retired bank guard, was receiving a small pension, and lived alone in a residence at 4043 N. Whipple Street,

Chicago, which he owned free of encumbrances. Appellant, who was many years younger, was a chiropractor, and also resided in Chicago. She was not related to Felkner but had known him for more than thirty years and was a fellow lodge member. Felkner, whose two wives preceded him in death, had two children and a grandchild, the appellees, but none of them lived with him.

Early in March, 1943, one Geneva Gould was the owner of a three-story brick building at 2145 Wilson Avenue, Chicago, and had listed it for sale with Quetschke and Company, a real-estate firm. Appellant saw the firm's sign on the premises and interviewed one of its employees, Leonard O. Maier, who showed her through the building and informed her that the sale price was $6900. Appellant testified that she told Maier she would think it over, but Maier's version was that she stated that she would have to consult William L. Felkner, an associate of hers, who would also have to inspect the premises. On March 31, Maier and Herbert Stange, a fellow real-estate salesman, went to the Felkner home on Whipple Street and, with no other persons present, Felkner signed a contract for the purchase of the Wilson Avenue property from Geneva Gould for $6900. The contract set out that $500 was paid as earnest money when signed and further that the contract was subject to the sale of Felkner's Whipple Street property for $4000 cash. Underneath the signature of Geneva Gould and William L. Felkner appeared the following handwritten notation: "Geneva Gould: You are hereby authorized and directed to convey title to the within described premises to William L. Felkner and Caroline G. Meier Pettersen as joint tenants and not as tenants in common. W. L. Felkner." There is nothing in the record to show when this direction was added to the contract, nor is it clear as to what person wrote it; however, there is no denial that the signature is that of William L. Felkner. Stange, who had filled in the balance of the contract form,

denied that the direction was in his handwriting and there is a slight implication in his testimony that the handwriting was that of Edward H, Streckert, still another employee of the real-estate firm. No money was paid on the contract at the time it was signed, but the following day $500 was paid at the broker's office. The circumstances of this payment are disputed and will be discussed later.

The Whipple Street property was sold April 13, 1943, and Felkner received a check for $3674.80, which he deposited in his savings account in the Northern Trust Company of Chicago three days later. During the forenoon of April 19, 1943, the sale of the Wilson Avenue property was consummated in offices of the real-estate firm in the presence of Felkner, Geneva Gould and Streckert, who acted for the firm. Appellant's brief represents that she too was present, but Streckert, the only witness to testify on the point, said, on direct examination, that only Felkner and Gould were present with him, and when cross-examined about appellant's presence stated that he could not recall if she was there or not. He further testified that the buyer, William L. Felkner had paid Geneva Gould directly, in cash, and that the closing statement he had prepared showed the amount to have been $6048.23. The deed which issued was immediately recorded and conveyed the property to Felkner and appellant as joint tenants. Shortly thereafter the two grantees moved into the property and resided there until Felkner's death on September 23, 1946. When his heirs learned that appellant claimed the premises as surviving joint tenant, they demanded a conveyance to them, and when appellant refused, this litigation was commenced.

Except as noted, there is no controversy as to the facts related thus far. The character of the trust relied upon by appellees is that of a resulting trust created by operation of law. Before probing the disputed facts in the case, it would be beneficial to review the legal principles applicable to a resulting trust and to the proof which tends to estab-

lish or refute it. A resulting trust arises by operation of law where one person pays or furnishes the consideration for a deed conveying real estate to another. Whether or not such a trust arises depends in every instance on the intention, at the time of the conveyance, of the person who furnishes the purchase price. (*Peters* v. *Meyers*, 408 Ill. 253; *Brod* v. *Brod*, 390 Ill. 312.) Such a trust arises, if at all, the instant the legal title is taken, and is founded upon the natural equity that he who pays for the property should enjoy it, unless he intended by the vesting of title to confer a beneficial interest upon the grantee. (*Spina* v. *Spina*, 372 Ill. 50; *Wiley* v. *Dunn*, 358 Ill. 97.) The payment of consideration raises a *prima facie* presumption in favor of a resulting trust. This presumption may be rebutted by parol proof of an intention on the part of the payor that the grantee shall take the beneficial interest and not merely the legal title. (*Rolofson* v. *Malone*, 315 Ill. 275.) No general rule can be stated that will determine when a conveyance made to one other than the person furnishing the consideration will carry with it a beneficial interest and when it will be construed to create a trust, but the intention must be gathered from the facts and circumstances as shown by the record in such case. (*Peters* v. *Meyers*, 408 Ill. 253; *Dodge* v. *Thomas*, 266 Ill. 76.) Where a deed, absolute in terms and without condition or reservation, conveys real estate to two persons as joint tenants, the language of the deed is sufficient to show an express intent to convey both the legal title and the beneficial interest to the two grantees, but if the purchase price was paid by only one of such grantees, this indicates an intention that this grantee is the only one beneficially interested in the property, and, under such facts, the expressed intent as shown by the deed must give way to the rule of equity which protects the party paying the purchase price by raising a resulting trust in his favor. (*Kane* v. *Johnson*, 397 Ill. 112.) Where, however, a husband pays

the purchase price for property conveyed to his wife, this court has recognized the rule that no presumption arises that he intended the beneficial interest to be in him, but instead the presumption is that he intended to make a gift to his wife. (*Mauricau* v. *Haugen,* 387 Ill. 186; *Nickoloff* v. *Nickeloff,* 384 Ill. 377.) A resulting trust which arises in favor of an ancestor at the time the property was purchased may be enforced by those who are beneficially interested in the estate, either as heirs-at-law or residuary devisees. (*Peters* v. *Meyers,* 408 Ill. 253; *Kane* v. *Johnson,* 397 Ill. 112.) In order to establish the trust, the one claiming it must submit proof which is so clear and convincing that it will sustain only one conclusion, and if the evidence produced is capable of a reasonable explanation on some theory other than that of the trust, the trust theory fails. (*Nickoloff* v. *Nickoloff,* 384 Ill. 377.) The burden is on the grantee to show that it was intended that she should have some beneficial interest in the property. *Niland* v. *Kennedy,* 316 Ill. 253.

The chief factual issue presented by the record in this case is whether Felkner or appellant paid the purchase price for the premises, and the first error assigned by appellant is that the trial court's finding that Felkner paid the entire amount is contrary to the manifest weight of the evidence. For the sake of clarity, we shall discuss the evidence relating to the payment of the earnest money of $500 separate from that relating to the final payment of $6048.23.

The proof offered by appellees to show that Felkner paid the earnest money is entirely documentary. It shows that he withdrew the sum of $500 from his savings account in the Northern Trust Company on April 1, 1943, and purchased a cashier's check for the same amount, payable to himself, at the same time and place. It does not appear who delivered the check, or when it was delivered, but, as we view it, there can be little doubt but that it was used to pay the earnest-money deposit, for the cancelled check

shows that Felkner endorsed the check to the real-estate company and that they deposited it in their bank. Felkner's bank record for the day of April 1, 1943, also shows that he had made a deposit of $350.84 prior to withdrawing the $500. Appellant more or less admits, particularly in her reply brief, that the check was used in paying the earnest money, but contends that she furnished him with $500 cash, at her home on the evening of March 30, 1943, to be used to make the payment. Her testimony to this effect was corroborated by one Max Manhardt, who was present as a guest that evening and who testified that he saw appellant count out $500 in cash and give it to Felkner. He said that as this was being done Felkner said: "I will take care of it, don't worry," and that appellant said: "Now I am going to call in the morning, Mr. Maier of the real estate office for him to pick up the money at your home." Pointing to these statements and to the fact that Maier did in fact visit Felkner on March 31, to execute the contract, and coupled with almost baseless inferences from Maier's testimony, appellant contends that credence must be given to the theory that Felkner paid Maier $500 in cash when the contract was signed on March 31. She reasons that if this is true there could have been no payment by check on April 1. The argument conveniently overlooks that Maier testified that the earnest money was paid at the office and that he did not know who paid it. Also, in her reply brief, appellant admits that the evidence shows that the check was used to pay the earnest-money deposit, and she relies solely on the argument that she had furnished Felkner with that amount with the specific understanding that he was to use it for that purpose. She points to the deposit of $350.84 that Felkner made in his bank account on April 1 and argues that it can be inferred that the money deposited was a portion of the $500 she had given him. We find no logic to such an argument and nothing in the evidence to support that inference, over the many other infer-

ences which could be drawn. This leaves only the testimony of appellant and Manhardt that she had given Felkner $500. We agree with the master that their testimony that appellant furnished this money is completely refuted by the documentary evidence offered by appellees, and the conclusion is strengthened by an analysis of the evidence which points to the time and place of payment.

Appellees' proof as to the final payment is also almost entirely documentary and again is countered by parol evidence offered for appellant. Felkner's bank records show that he withdrew $6160 from his account in the forenoon of April 19, the day of the final closing of the contract; that he bought a cashier's check for the same amount, payable to himself; and that he cashed the check at the bank the same day. It will be recalled that Streckert, of the real-estate firm, testified that the buyer paid Geneva Gould $6048.23 in cash, and that the buyer was William L. Felkner. As against this, Grace Prugger, a friend of appellant, testified that she went to appellant's office the morning of April 19 about 8:30 by prearrangement; that when she entered the office, appellant locked the door, opened a wall safe and counted out $6000 which she put in an envelope. Continuing, the witness stated that she and appellant then drove to Felkner's house on Whipple Street, where appellant again counted the money and gave it to Felkner, who put it in his pocket, following which they drove to the real-estate firm, where appellant and Felkner entered the office and the witness remained in the car. She stated that she waited one and one-half hours while the sale was being completed; that following this the trio drove to the Wilson Avenue property, inspected it, and then went to appellant's home where they had lunch; that after lunch Felkner said to appellant: "I would like to settle up with you today and get the whole thing cleared up," and requested that he be driven to the bank. She stated that she and appellant sat on a bench at the bank while Felkner went inside; that

he soon returned with a check in his hand and went away again remarking: "I will have to get it cashed," and that he soon returned and they drove back to appellant's home. After their return her version of what occurred is as follows: "* * * Mr. Felkner pulled out the money which he had in his pocket and said: 'Now here is $2500 that I have agreed to give you to finance the building.' He referred to the building on Wilson Avenue. He said: 'Now that pays rent and room as long as I live, is that right?' and she said 'Yes.' He then counted out another $2000 and gave it to the doctor saying: 'Now I want you to have this money to keep for anything I may need in the future, for illness or to pay my funeral expenses. I will trust you with that,' and she said, 'I will take care of it.' Then he said, 'Now I have some money here and I'm going to buy a tombstone for my wife's grave and I am going to get myself some new teeth and a few things I need and then I'm going to take a vacation. I have not had a vacation for years. I am going to take a trip east.' Later that summer he took a trip and was gone from four to six weeks. He said, 'This takes care of the business.' Dr. Meier [appellant] then drove him home and also drove me to my home in Oak Park."

Based upon the bank's permanent record of cashier's check sales on April 19, and upon daily bank customs, a bank employee expressed the opinion that Felkner had purchased the check for $6160 at approximately 11:00 o'clock in the morning. There was no exact record as to the time it was cashed but the same employee explained stamps on the cancelled check as meaning that it was cashed April 19 and posted by the bookkeeping department on April 20. Although appellant seeks to discredit the reliability of the bank records, when the orderly process followed and the records kept are weighed against the parol proof offered by appellant, it is logical and reasonable to assume with certainty that Felkner purchased the check at approximately

eleven o'clock in the morning. Such evidence greatly discredits Grace Prugger's version of what happened on the day of April 19, for by her computation of time Felkner was at the real-estate office at eleven o'clock. The same contradiction may be used to meet appellant's argument that Felkner went to the bank in the afternoon to cash the check he had purchased earlier in the day, for by Grace Prugger's testimony Felkner was in the company of appellant and witness from 9:30 in the morning, when they picked him up at his home, until at least midafternoon. The banking hours and distances involved make it impossible for Felkner to have made his withdrawal and purchased the check, both facts which are unequivocally shown by the bank records, and to have returned to his home before 9:30 A.M. The inconsistencies which arise in trying to reconcile her evidence to the almost unimpeachable documentary proof, shrouds her testimony with great doubt in our opinion and renders it of little value.

To further support her contention that she paid the purchase price for the premises, appellant argues that she was the person who paid $6048.23 in cash to the seller at the final closing. We find nothing in the record which leads us to believe this. Streckert, the real-estate man, was not even sure that appellant was present at the closing, and his words in describing the payment were that the money for the sale of the Wilson Avenue property was paid directly to the seller in his presence by the buyer, and that the buyer in the contract was Felkner. Since he could not recall if appellant was present, the "buyer" he referred to could have been no other person than Felkner.

Generally speaking, there are other portions of the record which make it difficult to believe that appellant furnished the purchase money. We see from her own testimony that about April 1 she professed not to have enough money to purchase the property and sought Felkner's financial aid, yet she now contends that she had $6000 in

cash a few days later. Had she obtained the money from other sources it is reasonable to assume that such fact would have been shown in this proceeding. Again, if she was the purchaser, it is unreasonable to believe that Felkner, because of his age and relation to her, would sign the contract or even enter into the negotiations. It is significant, too, that the direction that appellant be a joint tenant came from Felkner, which, when considered with the rest of the evidence, leads to the normal conclusion that he was, in fact, the person who paid the purchase money, and at the time the direction was given was already exercising his dominion over his property. Without further comment, it is enough to say that appellant has failed to sustain her defense, whereas appellees have furnished evidence which clearly and satisfactorily proves that the consideration paid for the Wilson Avenue property was furnished by Felkner, their ancestor.

It is appellant's next contention that the facts show that Felker intended her to have a beneficial interest in the premises thus negating the existence of a resulting trust. The indicia of intent relied upon are: (1) the direction in the contract that she be a joint tenant; (2) the joint tenancy deed itself; (3) Felkner's relinquishment of control over the property, once it was occupied, by permitting appellant to contract and pay for repairs, taxes and the like; and (4) a written declaration dated January 18, 1944, nine months after the real estate was purchased, in which he transferred to her all his household goods, for which appellant was, in turn, to furnish Felkner with board, room, washing, ironing and the "privileges ordinarily conceded to a member of a family in sickness or disability."

Treating upon these points inversely, we note that the so-called "declaration" refers only to personal property, makes no mention of the real estate and contains no language by which we could even infer an intent with respect

to the real estate. Since there is no competent evidence in the record which establishes that title to the real estate was taken in joint tenancy in accordance with an agreement that appellant was to provide a home for Felkner as long as he lived, we cannot accept appellant's argument that the declaration as to the personal property supports that concept. It should be noted, too, that the contention that the conveyance in joint tenancy was prompted by such an agreement, is contradicted by the witness for appellant who testified that Felkner paid appellant $4500 for the same purpose. The evidence by which appellant seeks to show that Felkner relinquished control of the premises to her is, likewise, of little probative value for there is an equal amount of the same type of evidence which shows that Felkner, too, contracted and paid for repairs and taxes. Appellant's proof on this point is greatly weakened by a clear showing that she overreached in some instances in seeking to make it appear that certain paid accounts had been carried in her name when they were actually carried in Felkner's name. In neither of the foregoing instances can it be said that the evidence indicates a clear-cut intention on Felkner's part to convey a beneficial interest to appellant. In considering this evidence it should be remembered, too, that a resulting trust of the nature here involved cannot be predicated upon a condition subsequent but must arise at the instant the purchase price is paid by one and title taken in the name of another, if it arises at all. *Brooks* v. *Gretz*, 323 Ill. 161; *Lord* v. *Reed*, 254 Ill. 350.

As to the direction contained in the contract that the property be conveyed to appellant as a joint tenant, it is our opinion that it can create no greater indication of Felkner's intent than the joint tenancy deed itself, and under the decision of *Kane* v. *Johnson*, 397 Ill. 112, the expressed intent as shown by the direction and the deed, standing alone, must give way to the rule of equity which

protects the party paying the purchase price by raising a resulting trust in his favor. Appellant makes the contention that there are other indicia of intent present here, which, when coupled with the intent as shown by the deed, outweigh the equitable presumption which arises from the fact that Felkner paid the purchase price, making the *Kane case* inapplicable. As indicated above, it is our opinion that the evidence relied upon falls short of being indicia of an intent to convey a beneficial interest to appellant.

In this court, appellant, for the first time, contends that there is a presumption of a gift of the beneficial interest from Felkner to herself arising out of their relationship. Not only does this contention come too late, but it is also inconsistent with the position she took before the master and cannot now be urged in this court, for a defense not presented by the answer to a complaint will not be considered on review. (*Bittner* v. *Field,* 354 Ill. 215; *Hill* v. *Siffermann,* 230 Ill. 19.) In addition there was no relationship between appellant and Felkner such as existed in *Moneta* v. *Hoinacki,* 394 Ill. 47, *Stromsen* v. *Stromsen,* 397 Ill. 260, and *Houdek* v. *Ehrenberger,* 397 Ill. 62, hence, no presumption of a gift can arise. A gift between strangers must be established by clear and convincing evidence. *Boltin* v. *Boltin,* 306 Ill. 473; *Rothwell* v. *Taylor,* 303 Ill. 226.

Lastly, appellant contends that the appellees are guilty of *laches.* This defense also was not raised in her answer to the complaint and will not be considered for the first time in this court. The general rule is that the defense of *laches* must be set up by plea or answer. *Spalding* v. *Macomb and Western Illinois Railway Co.* 225 Ill. 585.

The proof sufficiently shows that appellees' ancestor furnished the purchase price for the Wilson Avenue property and that a resulting trust arose in his favor at the time the title was taken jointly with appellant. Appellant, on the other hand, has failed to show that she paid the

consideration, or that Felkner intended for her to have the beneficial interest in the property. She therefore held the property in trust for him and after his death in trust for his heirs. The decree of the superior court of Cook County is affirmed.

*Decree affirmed.*